# IN THE SUPREME COURT OF TENNESSEE
## March 31, 2021 Session[1]

## STATE OF TENNESSEE v. JEREMY REYNOLDS

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Hamilton County
No. 290147   Barry A. Steelman, Judge**

_____

### No. E2018-01732-SC-R11-CD

_____

Jeremy Reynolds was convicted of premeditated first-degree murder at the conclusion of a jury trial in which the State was permitted to introduce evidence related to gang membership.  On appeal, the Court of Criminal Appeals concluded that the evidence of premeditation was legally insufficient and reversed the conviction.  The intermediate appellate court noted that the evidence was legally sufficient to support a conviction for the lesser-included offense of second-degree murder, but it nevertheless remanded for a new trial based on its determination that the trial court had abused its discretion in admitting certain pieces of evidence related to gang membership.  We accepted the State's appeal.  After a thorough review of the record, we conclude that the evidence was legally sufficient to support the conviction for premeditated first-degree murder.  We further conclude that there was no reversible error on the part of the trial court in admitting evidence related to gang membership.  Accordingly, we reverse the decision of the Court of Criminal Appeals and reinstate Reynolds's conviction for premeditated first-degree murder.

### Tenn. R. App. P. 11 Appeal by Permission;
### Judgment of the Court of Criminal Appeals Reversed;
### Remanded to the Criminal Court

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which ROGER A. PAGE, C.J., and SHARON G. LEE and HOLLY KIRBY, JJ., joined.  CORNELIA A. CLARK, J., not participating.[2]

---

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

[2] Sadly, our honored colleague and friend Justice Clark passed away on September 24, 2021.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Sophia Blumstein, Solicitor General; Katherine C. Redding, Assistant Attorney General; Neal Pinkston, District Attorney General; Lance W. Pope, Executive Assistant District Attorney General; and Kevin T. Brown, Assistant District Attorney General, for the appellant, State of Tennessee.

John G. McDougal (at trial and on appeal) and Chris Dixon (at trial), Chattanooga, Tennessee, for the appellee, Jeremy Reynolds.

Tyler M. Caviness and Jonathan Harwell, Knoxville, Tennessee, for the amicus curiae, Tennessee Association of Criminal Defense Lawyers.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

Twenty-year-old Wendell Washington ("the victim") arrived home between 10:30 and 10:45 p.m. on the night of May 5, 2013. He shared the home with his girlfriend, Harley Stokes, and his mother, Diana Washington, both of whom were inside the house when he arrived. The victim stood six feet, two and one-half inches tall and weighed one hundred thirty-three and one-half pounds. He was a roofer by trade but also sold marijuana and "pills." Upon arriving home, the victim parked across the street from his house. Ms. Stokes heard music from the victim's car as he arrived and walked to the front door. In the meantime, the victim came across the street and up onto the covered front porch of his house. The front porch was rectangular in shape, with the entrance to the porch on one end and the front door on the other. The front door had two small windows near the top of the door, and Ms. Stokes saw the victim through the glass. As Ms. Stokes began to open the front door, she heard a voice she did not recognize. The front door was pulled shut from the outside, and the victim disappeared from Ms. Stokes's view through the glass.

According to Ms. Stokes, the victim did not bring anyone to the house other than family members. Under the circumstances, Ms. Stokes decided to awaken Ms. Washington, who was asleep in a bedroom, and told her "something's going on outside." They returned to the front door, at which time they heard "some commotion" outside. One or two gunshots rang out, followed by "a bunch" of other gunshots. After the shooting stopped, Ms. Stokes and Ms. Washington went outside and found the victim alive but mortally wounded on the front porch. At no time did Ms. Stokes or Ms. Washington see who was outside with the victim. Neither woman knew who was shooting or even how many people were outside.

- 2 -

There were multiple 911 calls after the gunshots. In one of the calls, a neighbor reported seeing a white SUV driving past after the gunshots. Another neighborhood resident who lived not far from the victim's house later reported seeing a white or light silver Mitsubishi SUV drive erratically through a stop sign shortly after the gunshots. The first of the 911 calls occurred at 10:56 p.m.

At 11:03 p.m., approximately seven minutes after the first 911 call, security camera video recorded a light-colored SUV—similar in appearance to the Mitsubishi vehicle described by the neighborhood resident—arriving at the Erlanger Hospital emergency room. Two individuals exited the vehicle and carried a third—Jeremy Reynolds ("the Defendant")—into the hospital. They dropped off the Defendant, returned to the vehicle, and promptly left the premises. One of the individuals who dropped off the Defendant was later identified as Deaunte Duncan, but the other was never identified. When Chattanooga police later drove a logical route from the victim's house to the hospital, obeying all traffic laws, the trip took ten minutes and thirty-seven seconds.

The Defendant had been shot and required emergency treatment. There were two bullet holes in the front left side of the Defendant's shirt. One was consistent with a contact firearm discharge, and the other exhibited characteristics of a muzzle-to-target distance between three and twenty-four inches. There were also two bullet holes in the right pocket of the victim's jacket.[3] Both holes exhibited characteristics consistent with a contact firearm discharge, indicating that a gun was fired from inside the jacket pocket.

During surgery, medical personnel removed a .40-caliber jacketed hollow point bullet from the Defendant.[4] The bullet was fired from a gun with polygonal rifling, and because polygonal rifling leaves bullets relatively smooth with few individual characteristics, forensic examination could not link the bullet to a specific gun. However, expert testimony indicated that the bullet was most likely fired from a .40-caliber Glock firearm.

Police recovered a .40-caliber Glock Model 23 handgun with the victim's blood on it from the victim's home after the shooting. It belonged to the victim and had been moved

---

[3] The victim's mother testified that, although she was not sure, she believed the victim was right-handed.

[4] The ammunition terminology used at trial varied among the witnesses. In this opinion, we will use "bullet" to refer to a spent ammunition projectile. We will use "cartridge case" to refer to a spent ammunition casing. Finally, we will use "live round" to refer to unspent ammunition that contains both the bullet and the cartridge case.

from beside him on the front porch into the house by Ms. Stokes immediately after the shooting.[5]  Like the bullet removed from the Defendant during surgery, the live rounds remaining in the Glock 23 contained jacketed hollow point bullets.  There were eight live rounds in the Glock 23, and police located three additional .40-caliber live rounds on the front porch.  Police also located two .40-caliber cartridge cases that were later determined to have been fired from the Glock 23.  The eleven live rounds and the two cartridge cases were all the same brand of ammunition, and the magazine in the Glock 23 was capable of holding thirteen live rounds.

Unlike the Defendant, the victim did not survive his wounds.  The victim was shot a total of seven times: once in the left side of the chest, four times in the back of the left arm, and twice in the back.  The two wounds in the back were fatal, as they impacted vital organs, including extensive damage to the heart.  The chest wound resulted from a contact firearm discharge, but forensic testing was unable to determine a muzzle-to-target distance for the other wounds.  Only one bullet was recovered from the victim's body, corresponding to one of the gunshots to the victim's back.  It was a .38-caliber bullet.  However, when police took possession of the victim's effects at the hospital, the bag with his clothing also contained a .45-caliber bullet.  Likewise, when police took possession of the Defendant's effects at the hospital, there was a sealed clear jar with a .45-caliber live round in it next to the bag with the Defendant's clothing.

The evidence did not pinpoint the order of the victim's wounds.  However, given the trajectories of the wounds and the physical characteristics of the crime scene, the medical examiner testified at trial that the evidence was consistent with a close-range gunshot to the victim's chest, followed by the victim's body rotating with four gunshots to the back of the victim's left arm and two gunshots to the victim's back.  In rotating, the victim would have been turning away from the direction of gunfire and toward his only avenue of escape, the front door.

The crime scene contained a wealth of evidence, including bullets, cartridge cases, live rounds, and blood stains on the front porch.  The blood was solely that of the victim.[6]  As previously mentioned, police recovered two .40-caliber cartridge cases, both of which were fired from the victim's Glock 23 handgun.  Police also located two .45-caliber bullets and five .45-caliber cartridge cases.  The five .45-caliber cartridge cases and one of the

---

[5] Ms. Washington initially picked up the gun and some cartridge cases from the front porch, but Ms. Stokes ultimately took possession.  Ms. Stokes also brought inside $590 in cash and a bag of pills.

[6] As defense counsel stressed at trial, the Defendant's blood was nowhere to be found at the scene.

- 4 -

bullets recovered at the scene were all fired from the same gun.[7]  Significantly, the .45-caliber bullet recovered along with the victim's clothing at the hospital also was fired from the same gun as the five cartridge cases and bullet recovered at the crime scene. Additionally, forensic examination of the .45-caliber live round recovered along with the Defendant's clothing at the hospital revealed that it was not pristine and instead exhibited "mechanism marks," indicating that it had been loaded into a gun.  However, the live round could not be linked to a specific gun.

Approximately three months after the victim was killed, Chattanooga Police Officer Michael Early was investigating two robberies—wholly unrelated to the shooting of the victim—and conducted a traffic stop during which he discovered a .45-caliber Hi-Point handgun in the car of Gerald Jackson.[8]  Officer Early requested forensic testing of the Hi-Point handgun against cartridge cases that had been recovered from the scene of one of the robberies he was investigating.  Testing ultimately revealed that the Hi-Point handgun was linked to the five .45-caliber cartridge cases recovered from the scene of the victim's shooting, the .45-caliber bullet recovered from the scene, and the .45-caliber bullet recovered from the bag with the victim's clothing at the hospital.  According to the testimony of probation and parole officer Christina Barnes, however, Gerald Jackson was in custody in the West Tennessee State Penitentiary on the day the victim was shot and killed.

Based on these events, the Hamilton County Grand Jury indicted the Defendant for premeditated first-degree murder.[9]  Before trial, the State filed a notice of intent to introduce proof of the Defendant's, Deaunte Duncan's, and Gerald Jackson's membership in the Gangster Disciples gang.  See Tenn. R. Evid. 404(b).  The State argued that the evidence was relevant for the purposes of establishing the identity of the Defendant as the perpetrator and providing necessary contextual backdrop for the events surrounding the victim's killing, commonly referred to as "completing the story."  For his part, the

---

[7] The other .45-caliber bullet recovered at the scene bore the same class characteristics, but it was damaged too extensively to link it to a specific gun.

[8] There were two other individuals in the car at the time of the traffic stop: Jeremy Clark and Greg Hyder.  A Chattanooga Police Department evidence form, introduced at the Defendant's trial, identified Jeremy Clark as the "owner" of the handgun and indicated that the handgun had been recovered from under the rear seat of Jackson's car.

[9] The Defendant also was charged with unlawfully possessing a firearm after having been convicted of a violent felony.  That charge was severed from the murder charge, and the State ultimately dismissed it after the jury found the Defendant guilty of premeditated first-degree murder.

- 5 -

Defendant filed a pretrial motion in limine requesting that the trial court not allow any testimony "in relation to gangs or gang activity," arguing that such evidence would serve no purpose other than to inflame the jury.

## A.     Pretrial Hearing on Gang-Related Evidence

The trial court conducted a lengthy pretrial hearing on the admissibility of evidence of gang membership a week before trial.  See Tenn. R. Evid. 404(b)(1).  The State clarified that it did not intend to introduce proof of bad or violent acts of the Defendant, Duncan, or Jackson.  Rather, the State simply sought to introduce evidence that the Defendant, Duncan, and Jackson were all members of the Gangster Disciples.  The State asserted that evidence of shared gang membership was relevant in that it would help to explain why the Defendant and Duncan would be together at the hospital immediately after the victim was killed and why the Hi-Point handgun forensically linked to the scene of the crime would later be recovered from Jackson's car even though Jackson could not have been at the scene on the night of the shooting.  In response, the Defendant sought at the outset of the pretrial hearing to "exclude any mention of gangs."

The State offered the testimony of a single witness, Investigator Curtis Penney of the Chattanooga Police Department.  Penney was familiar with gang members and gang activity in the city in general, but he was most familiar with two specific gangs, one of which was the Gangster Disciples.  Investigator Penney testified that there was a nationally standardized process for validating whether an individual qualified as a gang member.  The Chattanooga Police Department maintained gang validation forms for this purpose.  The gang validation process and form assigned different numbers of points for various activities associated with gang involvement, divided into fifteen categories.  Individuals would need a certain total number of points to be considered a validated gang member.

Investigator Penney testified that the Defendant was a validated member of the Gangster Disciples.  He went on to explain how the Defendant qualified as a validated gang member.  Working off the gang validation form for the Defendant, which was introduced as an exhibit at the hearing,[10] Penney explained that the Defendant received points in four of the fifteen categories:

---

[10] The State introduced two forms for the Defendant at the pretrial hearing, one from the Chattanooga Police Department and one from the Tennessee Department of Correction ("TDOC").  The State later agreed not to introduce the TDOC form at trial, because it referred to the Defendant's "rank" as an "enforcer."  The State also agreed not to elicit testimony concerning rank or how an individual moves up in rank within the Gangster Disciples.

- 6 -

(1)    Gang tattoo/brands;
(2)    Use/possession of symbols, logos, colors, etc.;
(3)    Known contact with confirmed gang members; and
(4)    Participating in photo with confirmed gang members.

The State introduced as exhibits three photographs to help demonstrate how the Defendant qualified for points in the four categories.

One photograph—which appeared to have been posted by the Defendant on Facebook—showed a close-up of the Defendant's face and upper body, with a tattoo on his right arm visible. Investigator Penney explained that the tattoo was a six-point star and that it contained the letters "G" and "D," referring to Gangster Disciples. Penney further explained that the six-point star, or Star of David, was itself a Gangster Disciples symbol and paid homage to a co-founder of the Gangster Disciples by the name of David Barksdale, who became known as King David after he passed away. Lastly, Penney explained that the Facebook post itself appeared to originate from the moniker "Alleyez ON Sleepy." Penney testified that the Defendant is known within the Gangster Disciples as "Sleepy" or "Sleepy G." This photograph demonstrated how the Defendant qualified for points under the "gang tattoo/brands" category.

The other two photographs each depicted a group of individuals in a social setting. The Defendant appeared in both photographs. In one, the Defendant was posed in what Investigator Penney described as a six-point stance, again referring to the Star of David symbol. In the other, the Defendant was wearing a six-point-star belt buckle. Penney identified by name other individuals in each photograph who were members of the Gangster Disciples, including Deaunte Duncan in one of the photographs. Investigator Penney also explained that multiple individuals in both photographs were displaying gang signs with their hands. In particular, Penney identified signs that depicted the numbers "7" and "4," which referred to the seventh and fourth letters of the alphabet, "G" and "D," respectively. Additionally, Penney identified a hand sign that depicted a pitchfork. Penney explained how the pitchfork was a Gangster Disciples sign as follows:

Pitchfork stands for Folk Nation. Folk Nation is essentially where Gangster Disciples come from. Gangster Disciples itself was actually two different gangs that came together in Chicago and formed as one. The Gangster Disciple Nation fell under Folk Nation.

- 7 -

In the prison system or in a gang system, essentially you fall under two, you're either in the Folk Nation or you fall under the People Nation.

In this case, Gangster Disciples, they fall in Folk Nation. That symbolizes the uprising of nations with the pitchforks up, so it's very, very very common symbolism with Gangster Disciples.

These two photographs demonstrated how the Defendant qualified for points under the categories for use/possession of symbols, logos, colors, etc.; known contact with confirmed gang members; and participating in photos with confirmed gang members.

The State offered similar proof—through testimony from Investigator Penney, a gang validation form, and three additional photographs—that Deaunte Duncan was a member of the Gangster Disciples. Likewise, the State offered similar proof that Gerald Jackson was a member of the Gangster Disciples but did not introduce photographs in addition to Investigator Penney's testimony and the gang validation form.

Defense counsel cross-examined Investigator Penney at the pretrial hearing, focusing on two principal fronts. First, defense counsel delved into the point system associated with the various categories on the gang validation form. Defense counsel suggested that it was easy to qualify as a validated gang member under the point system, but Investigator Penney disputed that suggestion.[11] Second, defense counsel sought to elicit testimony that not all Gangster Disciples were involved in criminal activity and that some members fell under a "growth and development" movement that worked for community betterment. Investigator Penney freely admitted these points.

Following Investigator Penney's testimony, the State argued that there was clear and convincing evidence that all three men were members of the Gangster Disciples. The State asked the trial court to find the evidence relevant and admissible for the purposes of establishing the identity of the Defendant as the perpetrator of the victim's killing and completing the story. The State reiterated that it merely sought to admit evidence of an association among the Defendant, Duncan, and Jackson. The State argued that an association among the men—whether it be through a gang, a church group, or any other group—made it more likely that the Hi-Point handgun used at the scene of the crime could end up in Jackson's car three months after the shooting. For his part, the Defendant, although maintaining that evidence of gang membership was wholly irrelevant, stressed

---

[11] Investigator Penney testified that not even self-admission of gang membership was sufficient, by itself, to validate an individual as a gang member.

- 8 -

that there was a taint to a gang as an association that was not shared by other groups, and thus too much unfair prejudice accompanied such evidence.

The trial court found that the State had established by clear and convincing evidence that the Defendant, Duncan, and Jackson were all members of the Gangster Disciples. See Tenn. R. Evid. 404(b)(3). In addition, the trial court found the evidence relevant in that it connected the men and explained how the Hi-Point handgun could end up in Jackson's car three months after the victim was killed even though Jackson could not have been at the scene on the night of the shooting. See Tenn. R. Evid. 404(b)(2). The trial court agreed with the Defendant that there was a danger of unfair prejudice associated with evidence of gang membership in that jurors might assume that gang members are dangerous or commit violent acts. However, the trial court concluded that the danger of unfair prejudice did not outweigh the probative value of the evidence. See Tenn. R. Evid. 404(b)(4). To that point, the trial court noted that the danger of unfair prejudice could be mitigated through a limiting jury instruction.[12] Accordingly, the trial court found that the evidence was admissible for the material issues of establishing the identity of the Defendant as the perpetrator of the victim's killing and completing the story surrounding the shooting.

Immediately after the trial court's verbal ruling, the Defendant made an additional argument against admitting the photographs at trial. The Defendant asserted that the gang validation forms alone would be enough to establish what the State sought to prove and that, because the photographs showed individuals making gang signs, they were more prejudicial than probative. The State countered that it intended to limit the photographic evidence at trial to only three of the photographs introduced at the pretrial hearing:

(1)     The close-up photograph of the Defendant that displayed the tattoo on his arm;

(2)     The photograph of the Defendant in a social setting with a group with four other individuals, including Duncan, in which the Defendant wore a six-point-star belt buckle and the other individuals displayed "7" and "4" signs with their hands; and

(3)     The photograph of the Defendant in a social setting with a group of four other individuals, including Duncan, in which the other

---

[12] During the pretrial hearing, the Defendant stated that he "might need to ask for a special instruction" to limit any unfair prejudice associated with evidence of gang membership. The trial court commented that the pattern Rule 404(b) instruction served the purpose of limiting the jury's consideration of such evidence.

individuals—including Duncan on this occasion—displayed the "7" sign and the pitchfork sign with their hands.

The Defendant commented that although he could understand the admission of the close-up photograph and one of the group photographs, the State did not need to introduce all three photographs. Nevertheless, the trial court found all three photographs admissible.

### B.     Gang-Related Evidence at Trial

On the first day of trial, before the jury was empaneled, the Defendant renewed his objection to the introduction of evidence of gang membership. The Defendant commented that he was concerned about recent local news regarding gangs and the unfair prejudice that might result from it. The Defendant asked the trial court to reconsider its prior ruling. The trial court acknowledged that a violence reduction initiative had been the subject of local news, but the court was not persuaded that the development required a change in its prior ruling.[13]

Once the trial began, the subject of gang membership arose immediately, first in the State's opening statement. The extent of the State's comments on the subject, however, was that the Defendant, Duncan, and Jackson were all members of the Gangster Disciples. The Defendant also mentioned the subject of gangs during his opening statement, first in the midst of assailing the State's expected evidence:

> What you have here, ladies and gentlemen, is the State making assumptions, and that's one thing that we spoke about before that you have to watch is assumptions. Remember, they have to prove their case. They would love to assume, well, Mr. Reynolds is the one that shot. They will not be able to put a gun in Mr. Reynolds's hand. They will not be able to put Mr. Reynolds there. They will not be able to put any of the people that brought him in to there at that place during the shooting. They don't know who was there. They don't know how many, they don't know who it was, *they don't know if it was gang or not*. Alls [sic] they know is that, indeed, Mr. Washington was shot.

---

[13] The Defendant commented that he obviously could delve into the subject with potential members of the jury during voir dire. Transcription of voir dire is not included in the record on appeal.

(Emphasis added).  Later in his opening statement, when discussing the expected evidence that the Hi-Point handgun was discovered in Jackson's car three months after the victim was killed, the Defendant stated:

> Now, normally they would go ahead with regard to Mr. Jackson except Mr. Jackson's in jail.  They don't know how the gun gets to Mr. Jackson.  They want to go ahead and say Mr. Reynolds is the one that gave it to him but they have no proof to show that he gave it to them.  They're basically saying, "Well, they're all Gangster Disciples, so therefore, since all Gangster Disciples are there, they must be guilty."
>
> You'll find out that there's a lot of Gangster Disciples in here, and that doesn't even mean that it was any of the Gangster Disciples.  It doesn't mean that he got it from another Gangster Disciple; he could have gotten it from anyplace else.

In light of prior discussions between the trial court and the parties, the court gave the jury a limiting instruction immediately after opening statements:

> Members of the jury, if you find from the proof that the defendant was a member of a gang, you may not consider such evidence to prove his disposition to commit such a crime as that on trial.  The evidence may only be considered by you for the limited purpose of determining whether it provides the complete story of the crime.  That is, such evidence may be considered by you where the gang membership and the present alleged crime are logically related or connected or are part of the same transaction so that proof of the other tends or is necessary to prove the one charged, or is necessary for a complete account of the crime charged.
>
> Also, the evidence may be considered by you for the limited purpose of determining whether it provides the defendant's identity; that is, such evidence may be considered by you if it tends to establish the defendant's identity in the case on trial.
>
> I'll give you those instructions again in writing at the end of the trial, but for now I wanted to go ahead and tell those points to you, say that to you.

The instruction was substantially similar to the pattern jury instruction on "Evidence of Other Crimes." See 7 Tenn. Prac., T.P.I.—Crim. 42.10 (19th ed. 2015). The Defendant did not object to the instruction.

The State proceeded to put on its proof. When the time came to call Investigator Penney, the trial court conducted a jury-out discussion with the parties in anticipation of Penney's testimony. In conformance with the trial court's ruling at the pretrial hearing the week before trial, the State announced that it intended to introduce the gang validation forms for the Defendant, Duncan, and Jackson, as well as the three photographs the State ultimately settled on at the conclusion of the pretrial hearing.

The Defendant raised a specific objection—not previously articulated—to his gang validation form. The first page of the Defendant's gang validation form listed, in addition to background personal information, the fifteen categories of activities that could earn points toward validation, along with the points associated with each category and a place to mark the categories in which the Defendant received points. As previously mentioned, the Defendant received points in four categories:

(1)     Gang tattoo/brands;
(2)     Use/possession of symbols, logos, colors, etc.;
(3)     Known contact with confirmed gang members; and
(4)     Participating in photo with confirmed gang members.

The second page of the gang validation form contained a blank space corresponding to each of the possible categories for listing the supporting information explaining how the individual received points in the category. Thus, with respect to the Defendant, the second page of the gang validation form stated:

(1)     "720 on arm/6 point star on chest" on the line corresponding to gang tattoo/brands;
(2)     "In photo throwing up GD handsigns" on the line corresponding to use/possession of symbols, logos, colors, etc.;
(3)     "In photo with Jeremy Clark and Christian Woods, both GD" on the line corresponding to known contact with confirmed gang members; and
(4)     "In photo with Jeremy Clark and Christian Woods, both GD" on the line corresponding to participating in photo with confirmed gang members.

- 12 -

The Defendant's new specific objection was to the listing of the names of Jeremy Clark and Christian Woods.[14] The trial court denied the Defendant's request to redact the names.

The Defendant also renewed his broader objection "to anything coming in 'gang' on record." However, defense counsel acknowledged that "we've already had that argument." The trial court asked defense counsel what other objections he had with respect to the gang validation forms, to which defense counsel responded, "Nothing at this time."

With the jury-out discussion resolved, the State called Investigator Penney to the witness stand. Penney detailed his credentials and experience working in the "gang unit" of the Chattanooga Police Department. He was deemed an expert, with no objection from the Defendant. Penney explained the gang-member validation process in much the same manner as he had during the pretrial hearing.

Investigator Penney testified that the Defendant was a validated member of the Gangster Disciples. After this testimony, the trial court repeated the limiting instruction for the jury. On this occasion, the trial court emphasized: (1) that it was up to the jury whether to find that the Defendant was a member of a gang; and (2) that, if found, evidence of gang membership "must not be considered for any purpose other than . . . to complete the story of the crime and/or to establish the defendant's identity." Thereafter, Investigator Penney testified that Duncan and Jackson also were validated members of the Gangster Disciples.

The State introduced the gang validation forms for all three men and the three photographs previously discussed with the trial court. For both Duncan and Jackson, Investigator Penney briefly went through the gang validation form and explained the categories in which they received points. As part of this testimony, Penney explained the "7" and "4" hand signs, as well as the pitchfork hand sign, in much the same manner as he had during the pretrial hearing.

Investigator Penney took up the Defendant's gang validation form last. As he went through the form, he testified that under the gang tattoo/brands category, the Defendant received points in part because he had a "720" tattoo on his arm. Penney explained how 720 was associated with Gangster Disciples as follows:

---

[14] The Defendant ultimately focused his objection more on the name of Jeremy Clark being included on the gang validation form. The Defendant complained that Jeremy Clark did not appear in any of the State's photographs, whereas Christian Woods did appear with the Defendant in photographs.

The 720, this refers to types of ideology. Gangster Disciples have two different types of ideology. One is called the 360, 360 or 360 degrees of knowledge or 360 degrees of pure knowledge of Gangster Disciple [sic].

This is Larry Hoover, who was one of the originators of Gangster Disciples. This was part of their, for lack of better terms, during this time period, this was their idea of "shoot and ask questions later." The – years later – [.]

This testimony drew an objection from defense counsel, prompting a bench conference. The following colloquy occurred:

[DEFENSE COUNSEL]: Your Honor, I can see going ahead and saying, I mean, who was part of the gang and everything, but the history of the gangs, I don't understand that. The "shoot and ask questions later" I think is very prejudicial. I think that – I mean, we're going way afar of just identifying him as a member of a gang.

[PROSECUTOR]: Judge, Investigator Penney is testifying as to the basis of how he's validated a gang member and what these tattoos mean, what these hand signs mean, and how –

THE COURT: Well, he's testifying about the, as I understand it, the witness is testifying about the significance of what "720" means. I don't know what it means, I've been in the criminal justice system for 21 years now, so I'm going to allow him to explain.

Don't go too far with it though, Mr. [Prosecutor].

The trial court also specifically commented that defense counsel could continue to object if he felt "like it's going too far."

When Investigator Penney resumed his testimony, the State immediately moved away from the discussion of the 720 and 360 ideologies. Instead, the State transitioned to using the close-up photograph of the Defendant to demonstrate support for the gang tattoo/brands category on the gang validation form. In the photograph, Penney identified the tattoo on the Defendant's arm in the shape of a six-point star. Penney then repeated his testimony from the pretrial hearing that the six-point star was a Gangster Disciples symbol because it was "a sign of reverence for a, one of the founding fathers of Gangster Disciples

- 14 -

in Chicago." Defense counsel objected as to relevance, but the trial court overruled the objection. Investigator Penney then explained:

> The six-point star, it comes from a gentleman by the name of David Barksdale, who was one of the founding fathers, and the Star of David. After he passed away, this was their nod to him, a show of reverence, so the six-point star is used prolifically with the Gangster Disciples. As a matter of fact, each point of the star has a specific meaning.

The State then turned to the other categories of the gang validation form in which the Defendant received points: use/possession of symbols, logos, colors, etc.; known contact with confirmed gang members; and participating in photos with confirmed gang members. To support attributing points to the Defendant in the three categories, Investigator Penney used the photograph of the Defendant—wearing a six-point-star belt buckle—in a social setting with other individuals, including Duncan, displaying gang signs with their hands.

For his part at trial, defense counsel attempted to undercut the State's evidence through cross-examination of the State's witnesses. Defense counsel drew attention to the fact that neither the Defendant's DNA nor his fingerprints were found at the crime scene. Additionally, defense counsel emphasized that no witness could directly identify the Defendant as having been at the scene, as having wielded a gun, or as having shot the victim. Defense counsel questioned the legitimacy of the collection of the .45-caliber live round found along with the Defendant's clothing at the hospital. Defense counsel also elicited testimony that not all gang members were violent, that some gang members pursued community development, and that "G" and "D" could refer to "growth and development."

### C. *The Conclusion of the Trial*

At the close of proof, the trial court conducted a discussion with counsel regarding the jury charge. The trial court noted that it had already given the jury an instruction about how to consider evidence of gang membership on two occasions during the trial. The trial court intended to give the jury the same instruction in the charge and confirmed that counsel had an opportunity to review the proposed instruction. Defense counsel commented that the instruction "look[ed] fine." Thus, in the jury charge, the trial court gave substantially the same Rule 404(b) instruction as it had after opening statements.

- 15 -

With respect to offenses, the trial court charged the jury on premeditated first-degree murder and the lesser-included offenses of second-degree murder, voluntary manslaughter, reckless homicide, criminally negligent homicide, aggravated assault, reckless aggravated assault, assault, and reckless endangerment. The trial court also charged the jury on criminal responsibility for facilitation of a felony and criminal responsibility for the conduct of another.[15] The instructions were substantially similar to the pattern jury instructions. At the conclusion of the charge, the trial court confirmed that the Defendant had no special requests.

During his closing argument, defense counsel directly addressed the gang-related evidence. Defense counsel argued to the jury that the State "wants to use gangs to scare you, basically scare you into going ahead and convicting [the Defendant], because they don't have any evidence that Jeremy Reynolds did this." Defense counsel then reminded the jury of the trial court's instructions:

> The judge already instructed you as to the law on gangs, I'll go ahead and remind you of that a little bit, that the evidence may only be considered by you for the limited purposes [sic] of determining whether it provides a complete story of the crime. So basically, it's just to go ahead and state that, well, the gangs are some part of the story. Their thing of the story is that because he's a member of the Gangster Disciples, that obviously, that's how the gun got to Gerald Jackson. Now, do they have any proof of this? No. Ladies and gentlemen, they have no proof of anything.

Defense counsel returned to the subject of gang-related evidence later in his closing argument:

> And the State says that, to complete the story, they want you to bring in the gangs. Sleepy, remember, [the prosecutor] pointed at [the Defendant] and said, "Sleepy," to scare you, to basically say, "Oh, it's gangs." But they also want to say, "Well, there are other people involved in this." Where are they? Where is Deaunte Duncan? Where is Gregory Hyder? Shoot, where are all the Gangster Disciples since they all seem to be involved with it? Just fill up that back row with all the Gangster Disciples, let's put them all on trial

---

[15] Tennessee law provides that a person is criminally responsible for an offense committed by the conduct of another if, among other circumstances, the person—acting with the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense—solicits, directs, aids, or attempts to aid another person to commit the offense. Tenn. Code Ann. § 39-11-402(2) (2018).

for this if they're involved. Why? Because they have no proof of it. They have him being shot, they have Wendell Washington being shot, but they don't have any proof of anybody being told to shoot somebody. They don't have any proof of Mr. Reynolds shooting somebody. They have him being shot.

Ultimately, the jury returned a guilty verdict as to premeditated first-degree murder, and the trial court approved the verdict as thirteenth juror.

Thereafter, the Defendant timely filed a motion for a new trial in which he asserted: (1) that the evidence was legally insufficient to support the verdict; (2) that the trial court "improperly allowed mention of gangs in the testimony"; and (3) that "[e]vidence was introduced that should have been suppressed." The Defendant later filed an amended motion for a new trial in which he developed his arguments somewhat more fully. The arguments presented were: (1) the evidence was legally insufficient to establish that the Defendant was involved in the victim's killing at all and also was legally insufficient to show premeditation; (2) the trial court erred in allowing evidence that the Defendant was a gang member; and (3) the trial court erred in admitting the gang validation forms and the three photographs of the Defendant. The Defendant also asserted a claim for a new trial based on cumulative error.

When the trial court conducted a hearing on the motion, defense counsel informed the court that the Defendant wanted counsel to amend the motion to include additional claims for relief. The trial court provided defense counsel with an opportunity to amend the motion again. In the second amended motion for a new trial, defense counsel adopted the arguments he had made previously and included additional issues, two of which were: (1) the trial court erred in allowing evidence of prior bad acts of Gerald Jackson, and the State committed prosecutorial misconduct in eliciting such evidence; and (2) the trial court erred by not compelling the State to produce a photograph of the Defendant with Jeremy Clark, which was referred to in the Defendant's gang validation form. The trial court denied the motion for a new trial and sentenced the Defendant to life imprisonment. The Defendant timely appealed to the Court of Criminal Appeals.

### D. The Direct Appeal to the Court of Criminal Appeals

On appeal, the Defendant presented several issues for review, framed by the Court of Criminal Appeals as follows:

(1) the evidence was insufficient to support his conviction; (2) the trial court erred by admitting evidence that the Defendant and other individuals were gang members in violation of Tennessee Rules of Evidence 403 and 404(b); (3) exculpatory evidence, namely the victim's gunshot residue test and a photograph referenced by the gang report, were improperly withheld by the State; (4) the trial court erred by failing to compel the State to produce the above-referenced gunshot residue test and photograph; and (5) the cumulative effect of these errors deprived the Defendant of a fair trial.

State v. Reynolds, No. E2018-01732-CCA-R3-CD, 2020 WL 3412275, at *1 (Tenn. Crim. App. June 22, 2020), perm. app. granted, (Tenn. Nov. 16, 2020). As to the sufficiency argument, the intermediate appellate court rejected the Defendant's claim that the evidence did not sufficiently demonstrate his involvement in the killing of the victim. Id. at *22. However, the court reversed the Defendant's conviction for premeditated first-degree murder based on its conclusion that the evidence of premeditation was legally insufficient. Id. The court noted that the evidence was legally sufficient to support a conviction for second-degree murder. Thus, the court ordinarily would enter an amended judgment for that lesser-included offense. However, the court proceeded to find error with respect to the admission of certain gang-related evidence and concluded that its erroneous admission was not "harmless beyond a reasonable doubt." Id. at *26.

As to the gang-related evidence, the intermediate appellate court was "troubled by the breadth of the gang evidence presented in this case," but the court stated "that the Defendant did not lodge a specific objection to the breadth of Investigator Penney's testimony at trial or in the motion for a new trial." Id. at *25 (footnote omitted). Ultimately, the court concluded "that the general fact of the Defendant's gang membership, the gang validation form, and the photographs of the Defendant with other people making gang hand signs, as supported by Investigator Penney's testimony, were properly admitted." Id. at *26. However, the court took issue with the gang-related evidence presented at trial in three respects.

First, the court stated that the "prejudicial effect of the extensive background information about the Gangster Disciples and the origins of various gang signs outweighed its nonexistent probative value" and, as such, the "testimony should have been excluded."[16]

---

[16] In evaluating the balance between probative value and unfair prejudice, the court also stated that "the manner in which the gang evidence was argued exacerbated its prejudicial nature." Reynolds, 2020 WL 3412275, at *26. In particular, the court pointed to a portion of the State's rebuttal argument in which the State "used the Defendant's gang membership to urge the jury to make a statement with its verdict that

- 18 -

Id. The intermediate appellate court acknowledged the trial court's limiting instructions but concluded "that the Defendant has proven by clear and convincing evidence that the jury did not follow the trial court's limiting instructions because the jury issued a verdict contrary to the law and evidence." Id. Thus, the court stated, "we cannot say that the improper admission of the extraneous background gang evidence was harmless beyond a reasonable doubt." Id.

Second, the Court of Criminal Appeals found fault with some of the evidence pertaining to Gerald Jackson. As indicated above, the court did not take issue with the admission of evidence—through Investigator Penney's testimony and the gang validation form—that Jackson was a member of the Gangster Disciples. However, the court did state:

> Officer Early's testimony regarding the two robberies in which, it was implied, Mr. Jackson participated and used the .45-caliber pistol, was not properly admitted. The fact that these robberies occurred, let alone any details surrounding them, was wholly irrelevant to the Defendant's case and should have been excluded. Likewise, the testimony that the gun had been used in two robberies created an implication that the pistol was habitually used by gang members to commit crimes, making the danger of unfair prejudice extremely high.

Id. at *27. The intermediate appellate court concluded that "[t]he trial court abused its discretion by allowing this testimony" and stated that "[o]n retrial, Officer Early should not be permitted to testify regarding other crimes in which the .45-caliber pistol was potentially used." Id.

Third, the Court of Criminal Appeals noted that "the repeated mention of the names of several other gang members who were not connected to this case was irrelevant and improperly admitted." Id. The court, however, did acknowledge that the mention of the names of other gang members was "not specifically raised as an issue." Id.

The Court of Criminal Appeals found no merit to the Defendant's allegations of error with respect to the State's failure to provide the photograph of Jeremy Clark referred

---

it would not tolerate the Defendant's 'violence, his shooting, his gangs.'" Id. However, the court recognized that the Defendant did not object to the rebuttal argument and concluded that the argument did not merit plain error relief. Id. The Defendant has not taken issue with the rebuttal argument in this Court.

to in the Defendant's gang validation form.[17] Id. at *29. Because the intermediate appellate court found reversible error with respect to the admission of testimony about background information and the origins of gang signs, the court did not address the Defendant's allegation of cumulative error. Id. at *30.

We granted the State's application for permission to appeal. Based on our thorough review of the record, we have determined that the evidence was legally sufficient to support the Defendant's conviction for premeditated first-degree murder. Furthermore, we conclude that the Defendant is not entitled to relief on any of the evidentiary issues he has raised. Accordingly, we reverse the decision of the Court of Criminal Appeals and reinstate the Defendant's conviction for premeditated first-degree murder.

## II. ANALYSIS

The State appeals from the adverse decision of the Court of Criminal Appeals, raising two issues. First, the State argues that, contrary to the holding of the intermediate appellate court, the evidence of premeditation was legally sufficient. Second, the State argues that the intermediate appellate court incorrectly concluded that the Defendant must be afforded a new trial because of the improper admission of gang-related evidence.

For his part, the Defendant maintains, as he argued before the Court of Criminal Appeals, that the evidence was legally insufficient to support any conviction in that the proof did not show that he shot the victim or was responsible for the victim being shot. With respect to the admission of gang-related evidence, the Defendant maintains in this Court that the trial court erred in admitting any evidence of gang membership, including the gang validation forms and the photographs. In an issue loosely related to the challenge to the admission of evidence of gang membership, the Defendant reiterates his vague argument that the trial court erred by admitting evidence of prior bad acts of Gerald Jackson, presumably referring to the alleged robberies mentioned in the context of the recovery of the Hi-Point handgun from Jackson's vehicle. Additionally, the Defendant reiterates his argument that the trial court erred by not compelling the State to produce the photograph of him with Jeremy Clark that was referenced in his gang validation form, and he also asserts that the State's failure to produce the photograph amounted to a Brady violation. See generally Brady v. Maryland, 373 U.S. 83 (1963) (requiring the government

---

[17] Likewise, the Court of Criminal Appeals found no merit to the issue involving the victim's gunshot residue kit, Reynolds, 2020 WL 3412275, at *28–29, and the Defendant has not raised the issue in this Court.

to disclose evidence favorable to the accused).  Lastly, the Defendant argues that the cumulative effect of these various errors rendered his trial unfair.

### A.    Sufficiency of the Evidence

Our standard of review regarding a challenge to the sufficiency of the evidence recognizes that a guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt." State v. Gentry, 538 S.W.3d 413, 420 (Tenn. 2017) (citing State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012)).  Accordingly, the defendant bears the burden on appeal of demonstrating why the evidence was legally insufficient to support the verdict.  State v. Jones, 589 S.W.3d 747, 760 (Tenn. 2019).  The familiar inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings . . . of guilt beyond a reasonable doubt.").

On appeal, we do not weigh the evidence anew.  Instead, a jury's guilty verdict operates to accredit the testimony of the witnesses for the State and resolves all evidentiary conflicts in favor of the State.  Jones, 589 S.W.3d at 760.  Thus, we afford the State the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn from the evidence.  State v. Williams, 558 S.W.3d 633, 638 (Tenn. 2018).  "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." Id. (citing State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011)).

The Defendant was convicted of premeditated first-degree murder.  Tennessee law defines the offense as the unlawful, intentional, and premeditated killing of another.  Tenn. Code Ann. §§ 39-13-201, -202(a)(1) (2018 & Supp. 2021).[18]  In this context, a person acts intentionally when it is the person's conscious objective or desire to cause the death of the alleged victim.  Tenn. Code Ann. § 39-11-302(a) (2018).  A premeditated act refers to an act done after the exercise of reflection and judgment.  Tenn. Code Ann. § 39-13-202(e) (Supp. 2021).

---

[18] The elements of the relevant offense have not changed since the victim was killed in 2013.  As a result, we cite to the current version of the statute.

Although we accepted the State's appeal involving the legal sufficiency of the evidence of premeditation, we first address the Defendant's argument that the evidence was legally insufficient to support any conviction because the proof showed at most that he was shot by the victim rather than establishing that he shot the victim or was responsible for the victim being shot. Viewing the evidence in the light most favorable to the State, we disagree with the Defendant.

The proof at trial showed that, immediately after the shooting, a white SUV was observed leaving the scene. A short time later, consistent with the time it would take to drive that distance from the scene, a light-colored SUV—which matched a description given by a neighborhood resident—arrived at the emergency room of Erlanger Hospital. Deaunte Duncan and another individual brought the Defendant inside and promptly left. The Defendant had been shot twice at close range. A .40-caliber bullet, most likely fired from a Glock firearm, was recovered from the Defendant during surgery. A .40-caliber Glock handgun that belonged to the victim was recovered at the scene, along with two .40-caliber cartridge cases. Police also recovered three .40-caliber live rounds at the scene, and there were eight live rounds in the Glock itself. The gun's magazine had a capacity of thirteen rounds. The live rounds and cartridge cases were the same brand of ammunition.

As for the victim, he was shot seven times. One of the wounds was a close-range gunshot to the left side of the victim's chest. The two fatal wounds were gunshots to the victim's back. A .38-caliber bullet was recovered from the victim's body, but police recovered two .45-caliber bullets and five .45-caliber cartridge cases at the scene, as well as a .45-caliber bullet from the bag with the victim's clothing at the hospital. Police also recovered a .45-caliber live round along with the Defendant's clothing from the hospital room where the Defendant was being treated shortly after the shooting. The live round exhibited signs of having been loaded into a firearm.

The Defendant's two wounds were to his front left side, and there were two holes in the victim's right jacket pocket where a firearm had been discharged. The Defendant's wounds were associated with close-range gunshots. In addition, one of the victim's wounds was a close-range gunshot to his front left side. From this evidence, a rational jury could conclude that the Defendant and the victim were face-to-face and shot each other in the chest at close range, the victim using his .40-caliber Glock handgun and the Defendant using at least the .45-caliber Hi-Point handgun. The State's proof also supported that the victim, having been shot in the chest, turned away from the shooting and toward his only available route of escape, the front door, at which time he was shot four times in the back of the left arm and twice in the back. Considering all of the proof, we agree with the Court

- 22 -

of Criminal Appeals that the evidence was legally sufficient to establish the Defendant's identity and involvement in the victim's killing, as well as its intentional nature.

Respectfully, however, we must disagree with the intermediate appellate court's conclusion that the evidence was legally insufficient to support the element of premeditation. As previously mentioned, a premeditated act refers to an act done after the exercise of reflection and judgment. Tenn. Code Ann. § 39-13-202(e) (Supp. 2021). Tennessee law further provides:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. The existence of premeditation is a question of fact to be determined by considering all of the evidence. State v. Clayton, 535 S.W.3d 829, 845 (Tenn. 2017); State v. Dickson, 413 S.W.3d 735, 746 (Tenn. 2013).

Because premeditation involves the defendant's state of mind, of which there is often no direct evidence, we have "long recognized that premeditation may be proved by circumstantial evidence," State v. Davidson, 121 S.W.3d 600, 614–15 (Tenn. 2003), and "may be inferred from the manner and circumstances of the killing," State v. Kiser, 284 S.W.3d 227, 268 (Tenn. 2009) (quoting Finch v. State, 226 S.W.3d 307, 318 (Tenn. 2007)). Through multiple cases over many years, we have identified numerous specific circumstances that may bear on the existence of premeditation:

(1)     The use of a deadly weapon on an unarmed victim;
(2)     The particular cruelty of the killing;
(3)     Threats or declarations of intent to kill;
(4)     The procurement of a weapon;
(5)     Any preparations to conceal the crime undertaken before the crime was committed;
(6)     The destruction or secretion of evidence of the killing;
(7)     Calmness after the killing;
(8)     Evidence of motive;
(9)     The use of multiple weapons in succession;
(10)    The infliction of multiple wounds or repeated blows;

- 23 -

(11)　Evidence that the victim was retreating or attempting to escape when killed;

(12)　The lack of provocation on the part of the victim; and

(13)　The failure to render aid to the victim.

See, e.g., Clayton, 535 S.W.3d at 845; Dickson, 413 S.W.3d at 746; Kiser, 284 S.W.3d at 268–69; State v. Leach, 148 S.W.3d 42, 53–54 (Tenn. 2004); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997).

We also have recognized that the list of specific circumstances developed through Tennessee caselaw is not exhaustive. Leach, 148 S.W.3d at 54 (citing Davidson, 121 S.W.3d at 615). Thus, the trier of fact "is not limited to any specific evidence when determining whether a defendant intentionally killed the victim 'after the exercise of reflection and judgment.'" Davidson, 121 S.W.3d at 615 (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e))). Ultimately, then, premeditation "may be established by any evidence from which a rational trier of fact may infer that the killing was done 'after the exercise of reflection and judgment.'" Leach, 148 S.W.3d at 53 (quoting Tenn. Code Ann. § 39-13-202(d) (current version at Tenn. Code Ann. § 39-13-202(e))).

In evaluating the jury's finding of premeditation in this case, the Court of Criminal Appeals acknowledged that the victim suffered multiple wounds, but the court commented that this circumstance was "not enough, standing alone, to prove premeditation." Reynolds, 2020 WL 3412275, at *22 (citing State v. Brown, 836 S.W.2d 530, 543 (Tenn. 1992), superseded on other grounds by statute as stated in State v. Harrell, No. E2005-01531-CCA-R3-CD, 2007 WL 595885 (Tenn. Crim. App. Feb. 26, 2007), perm. app. denied, (Tenn. June 25, 2007)). The court also acknowledged that the Defendant was "possibly" armed, but stated that it was "not proof that he armed himself in preparation for this confrontation." Id. In addition, the court apparently found unpersuasive that the Defendant failed to render aid to the victim, stating that, given the Defendant's wounds, "it is unclear whether he was capable of rendering aid or summoning help at the crime scene."[19] Id. Lastly, the court made a passing reference to evidence that "the victim was

---

[19] The Court of Criminal Appeals also took issue with this circumstance by noting that the State cited it at oral argument on appeal but did not argue it to the jury. Reynolds, 2020 WL 3412275, at *22 n.8 (commenting that "[t]he State may not rely on different arguments on appeal than were presented at trial"). Respectfully, we believe the intermediate appellate court's comment is misplaced. We certainly have stated that "[a]s a general rule, a party may not litigate an issue on one ground, abandon that ground post-trial, and assert a new basis or ground on appeal." Leach, 148 S.W.3d at 55. However, in this instance, the State's election to point to certain evidence in the record as supporting premeditation on appeal, even if not

- 24 -

attempting to flee," but it did not discuss the evidence in its analysis of premeditation. Id. at *22 n.8.

From our review, the record reveals that the victim's girlfriend heard the victim's music as he arrived home and parked across the street, prompting her to walk to the front door. She saw the victim's face through a window in the front door, but as she began to open the door, she heard a voice she did not recognize. Thus, the proof shows that the deadly encounter was initiated just after the victim arrived home. Based on the forensic evidence and the hospital surveillance video, a rational jury could conclude that the Defendant, Duncan, and an unknown third person were at the scene. They were not invitees, since the victim did not bring anyone other than family to his house. Thus, a rational jury also reasonably could conclude that the Defendant and his compatriots initiated the deadly encounter. The evidence supports an inference that the victim was concerned or sensed the danger of the encounter from the beginning, as he pulled the door shut after his girlfriend had started to open it. Shortly thereafter, one or two gunshots rang out, followed by "a bunch" of additional gunshots. Considering all of the evidence, a rational jury could conclude not only that the Defendant armed himself for an encounter that he initiated, but also that the Defendant was face to face with the victim on the porch. Furthermore, a rational jury could conclude that the Defendant shot the victim in the chest at close range. The proof also supports a conclusion that the victim attempted to retreat when he turned away from the Defendant and headed toward the front door, which was his only escape route. As the victim turned for the door, he was shot four times in the back of the left arm and twice in the back. The wounds in his back were the fatal wounds. The Defendant and his compatriots then fled the scene, leaving the victim mortally wounded on the front porch.

We are mindful that in determining the existence of premeditation, the trier of fact "may not engage in speculation." State v. Jackson, 173 S.W.3d 401, 408 (Tenn. 2005). However, in evaluating a jury's finding of premeditation, our duty "is not to contemplate all plausible inferences in the Defendant's favor, but to draw all reasonable inferences from

stressed during the State's argument at trial, bore no relation to the trial court's decision to admit evidence. We rightfully may consider when "the State argues new legal theories based on the facts already contained in the record." Johnson v. State, 38 S.W.3d 52, 60 n.8 (Tenn. 2001). Stated another way, an appellate court's duty in evaluating the sufficiency of proof of premeditation is to examine any and all evidence from which a rational trier of fact reasonably could conclude that the killing was perpetrated after the exercise of reflection and judgment. See Leach, 148 S.W.3d at 53. Whether the State stressed particular evidence to the jury during argument at trial versus during argument on appeal does not bear on whether the evidence exists in the record. Nevertheless, under the circumstances of this case, we do not believe the Defendant's failure to render aid to the victim weighs in favor of the existence of premeditation.

the evidence in favor of the State." State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011). Having evaluated the proof in this case in the light most favorable to the State and drawn all reasonable inferences in favor of the State, we have determined that the evidence was legally sufficient to support the jury's finding of premeditation. The evidence supports the procurement and use of multiple weapons for an encounter that the Defendant and his compatriots initiated just after the victim arrived at the scene. The evidence further establishes the infliction of multiple wounds on the victim, including a close-range gunshot to the chest and two gunshots to the back. The evidence also establishes that there were a "bunch" of gunshots after the first gunshot or two, thus supporting an inference that the vast majority of the victim's seven gunshot wounds occurred once the victim had begun to retreat as he turned toward the only available path of escape from his assailants. Although perhaps the proof supporting the jury's finding of premeditation in this case may not be overwhelming, that is not required by the applicable legal standards. As a result, we conclude that the proof was legally sufficient to support the verdict, and we reverse the contrary holding of the Court of Criminal Appeals.

## B.    Admission of Gang-Related Evidence

Having determined that the evidence supports the Defendant's conviction for premeditated first-degree murder, we turn to examine whether any evidentiary issues nonetheless require that the Defendant be granted a new trial. We first address the admission of gang-related evidence. Given the manner in which the issue was litigated at trial and later addressed by the Court of Criminal Appeals, we must take care to set forth with precision both what occurred below and the posture before this Court.

In reviewing the Defendant's direct appeal, the Court of Criminal Appeals found no error in the trial court's admission of evidence of the fact of gang membership of the Defendant, Duncan, and Jackson—through the testimony of Investigator Penney, the gang validation forms, and the three photographs.[20] Reynolds, 2020 WL 3412275, at *26. However, the Court of Criminal Appeals determined that the trial court abused its discretion by admitting "background information about the Gangster Disciples and the origins of various gang signs." Id. The court concluded that unfair prejudice associated with this evidence outweighed "its nonexistent probative value." Id. The court further determined that "because the jury issued a verdict contrary to the law and evidence"—that is, a conviction for premeditated first-degree murder when the evidence was legally

---

[20] The Court of Criminal Appeals stated that the evidence of shared gang membership was admissible to provide necessary contextual background or to "complete the story." Reynolds, 2020 WL 3412275, at *24–25.

insufficient to support the verdict—it could not say "that the improper admission of the extraneous background gang evidence was harmless beyond a reasonable doubt." Id.

Having found reversible error on that basis, the intermediate appellate court went on to identify two other instances of what it deemed to be improper evidentiary rulings to give direction to the trial court upon remand. First, the court found improper the testimony of Officer Early that the Hi-Point handgun was recovered from Jackson's car during an investigation of two robberies. The court stated that the evidence linking the gun to robberies unrelated to the killing of the victim "was wholly irrelevant to the Defendant's case and should have been excluded." Id. at *27. Second, the court found improper the mention of the names of gang members unconnected to the case, stating that such evidence was "irrelevant and improperly admitted." [21] Id. In neither instance did the court engage in an analysis of whether the error was or was not harmless. See id.

We granted the State permission to appeal from the decision of the Court of Criminal Appeals, and both the State and the Defendant have presented issues for review pertaining to the admission of gang-related evidence. Against the backdrop of the nature of the decision of the intermediate appellate court, as just described, the issues presented to this Court with respect to the admission of gang-related evidence are:

(1)    The Defendant's argument that the trial court erred in admitting evidence of gang membership, with a particular focus on the gang validation forms and the three photographs;[22]

(2)    The State's argument that the Court of Criminal Appeals incorrectly concluded that the admission of evidence of background information about the Gangster Disciples and the origins of various gang signs was reversible error;

---

[21] The court acknowledged that the Defendant had not raised this issue on appeal. Reynolds, 2020 WL 3412275, at *27.

[22] The Defendant's argument in this Court is not a model of clarity. His argument appears to focus on the gang validation forms and photographs, and specifically whether they were more prejudicial than probative. At times during the pretrial motion hearing, the Defendant argued that because there was no contention that the killing of the victim was a gang crime, any evidence of gang membership was irrelevant and, thus, more prejudicial than probative. His motion for a new trial contained both the general challenge to evidence of gang membership and the specific challenge to the gang validation forms and photographs. Although the Defendant's focus in this Court appears to be on the gang validation forms and photographs, we will briefly address the Defendant's broad challenge to the relevance of evidence of gang membership.

(3)     The State's argument that the Court of Criminal Appeals incorrectly concluded that the trial court abused its discretion by admitting Officer Early's testimony that included references to recovering the Hi-Point handgun from Jackson's car in the course of investigating robberies unrelated to the killing of the victim; and

(4)     The State's argument that the Court of Criminal Appeals incorrectly concluded that the trial court abused its discretion by admitting testimony as to the names of gang members who were not connected to the killing of the victim.

### i.     Evidence of Gang Membership

Tennessee law provides that proof of other crimes, wrongs, or acts committed by the defendant is not admissible to prove the defendant's propensity to commit a crime. See Tenn. R. Evid. 404(b). See generally State v. Rodriguez, 254 S.W.3d 361, 375–76 (Tenn. 2008) (discussing general exclusion of propensity evidence). The trial court admitted evidence that the Defendant, Duncan, and Jackson were members of the Gangster Disciples. The parties agree that the admissibility of evidence that the Defendant was a gang member is governed by Tennessee Rule of Evidence 404(b).[23] Rule 404(b) provides:

> Other Crimes, Wrongs, or Acts. — Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

[23] The State has argued since the pretrial Rule 404(b) hearing—and the Defendant has never contested—that the admissibility of evidence of Duncan's and Jackson's gang membership, as third parties rather than defendants, is governed by Tennessee Rule of Evidence 403. See State v. Stevens, 78 S.W.3d 817, 837 (Tenn. 2002) (citing State v. DuBose, 953 S.W.2d 649, 653–54 (Tenn. 1997)) (stating that evidence of other crimes, wrongs, or acts committed by a person other than the defendant is analyzed under Rule 403). But see Tenn. Code Ann. § 24-7-125 (2017) (applying Rule 404(b) standards with respect to proving "the character of any individual, including a deceased victim, the defendant, a witness, or any other third party"). The principal substantive difference in the approaches is that under Rule 403, the danger of unfair prejudice associated with the evidence must "substantially" outweigh probative value for the evidence to be excluded. Tenn. R. Evid. 403. In practical terms, then, exclusion is more difficult under Rule 403. For the sake of simplicity, we will address the admissibility of evidence of Duncan's and Jackson's gang membership as part of our examination of the admissibility of the evidence of the Defendant's gang membership.

(1)    The court upon request must hold a hearing outside the jury's presence;

(2)    The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3)    The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4)    The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

The record in this case demonstrates that the trial court complied with the structure detailed in Rule 404(b). Thus, we will reverse the trial court's decision to admit evidence of gang membership only upon finding an abuse of discretion. See State v. Clark, 452 S.W.3d 268, 287 (Tenn. 2014); State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." Lee Med., Inc. v. Beecher, 312 S.W.3d 515, 524 (Tenn. 2010); see also Clark, 452 S.W.3d at 287 (citing State v. Banks, 271 S.W.3d 90, 116 (Tenn. 2008)).

In deciding to admit evidence that the Defendant, Duncan, and Jackson were all members of the Gangster Disciples, the trial court found the evidence admissible for the non-propensity purposes of: (1) proving the identity of the Defendant as the perpetrator, see State v. Gilliland, 22 S.W.3d 266, 271 n.6 (Tenn. 2000) (recognizing the admissibility of Rule 404(b) evidence to prove identity), and (2) providing necessary contextual background, see id. at 272 (recognizing the admissibility of contextual background evidence because knowledge of events surrounding the commission of the crime may be necessary for the jury to "realistically evaluate the evidence" (quoting Albrecht v. State, 486 S.W.2d 97, 100 (Tex. Crim. App. 1972))); see also Clark, 452 S.W.3d at 288 (identifying various non-propensity purposes to admit Rule 404(b) evidence recognized under Tennessee law). The record demonstrated that the State did not seek to introduce evidence of gang membership to prove that the Defendant killed the victim in conformity with his gang membership. Instead, as the trial court observed, the evidence was relevant to prove a connection between the Defendant, Duncan, and Jackson and thereby offered an explanation of how the Hi-Point handgun could end up in Jackson's car three months after the victim was killed even though Jackson was not at the scene on the night of the shooting. The trial court also found that the danger of unfair prejudice associated with the evidence

of gang membership did not outweigh the probative value of the evidence. The Court of Criminal Appeals upheld the trial court's decision to admit evidence of the fact of gang membership through Investigator Penney's testimony, the gang validation forms, and the photographs. Reynolds, 2020 WL 3412275, at *26.[24]

We conclude that the trial court did not abuse its discretion in admitting the evidence of gang membership. The record shows that the State recovered a handgun forensically linked to the crime scene, evidence of obvious significance. Although a .45-caliber live round was recovered at the hospital along with the Defendant's effects, the Hi-Point handgun was not. Instead, the Hi-Point handgun was recovered from Jackson's car three months after the victim was killed. Given these facts, an association or connection between the three men was relevant because the connection made it more probable that the Defendant was linked to the Hi-Point handgun even though the handgun was not located with the Defendant's effects immediately after the killing. See Tenn. R. Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). Furthermore, the gang validation forms were evidence that directly established the fact of the Defendant's, Duncan's, and Jackson's common gang membership. The photographs helped explain how the Defendant qualified for points toward validation in various categories on the form and provided the jury with information to evaluate the persuasiveness of the evidence of gang membership. Thus, this evidence was relevant and admissible because it provided important contextual background by establishing an association or connection between the Defendant, Duncan, and Jackson. See Gilliland, 22 S.W.3d at 271 ("If the contextual evidence is relevant to an issue other than criminal propensity and its probative value is not outweighed by the danger of unfair prejudice, then that evidence may be properly admissible.").[25]

---

[24] We note that although the intermediate appellate court found the evidence admissible for the purpose of providing necessary contextual background, it concluded that the trial court "abused its discretion by finding that the Defendant's gang membership was relevant to prove his identity as the person who killed the victim." Reynolds, 2020 WL 3412275, at *24 (stating that "[i]n the context of identity, Rule 404(b) evidence is typically offered to prove the similarity between a prior act and the instant crime"). The State has not argued directly against the court's conclusion in this regard. Because we need not evaluate the conclusion to resolve the admissibility of the evidence of gang membership, we do not address the intermediate appellate court's conclusion that the evidence was not admissible for the purpose of proving identity.

[25] We observed in Gilliland that, apart from the traditional analysis under Rule 404(b), the admissibility of contextual background evidence depends on whether the absence of the evidence would "create a chronological or conceptual void" that would "likely result in significant jury confusion concerning the material issues or evidence in the case." Gilliland, 22 S.W.3d at 272. The Defendant has

- 30 -

The Defendant questions the relevance of evidence of gang membership by pointing out that there was no proof that the shooting of the victim was a gang crime. The Defendant is correct in his observation, and the State was clear at all times that it did not allege that the shooting was a gang crime. However, the relevance of the evidence of shared gang membership is plainly apparent from our discussion in the preceding paragraph. A lack of proof that the shooting of the victim was a gang crime does not detract from that relevance under the circumstances of this case.

Additionally, we agree with the courts below that the danger of unfair prejudice did not outweigh the probative value of the evidence. The probative value of the evidence of shared gang membership among the three men was significant. Proof of common gang membership served as circumstantial evidence supporting an inference that the Defendant possessed a gun directly linked to the shooting of the victim.

As for the danger of unfair prejudice,[26] we discern minimal unfair prejudice associated with the gang validation forms. The Defendant's gang validation form contained nothing inflammatory. Instead, it simply identified the categories in which the Defendant qualified for points in rote fashion, as we previously described. Duncan's gang validation form was much the same with one minor exception. When describing how Duncan qualified for points for "known contact with confirmed gang members," the form made reference to a traffic stop with validated Gangster Disciples during which police "recovered a weapon from the vehicle." However, we cannot conclude that this vague reference engenders a danger of unfair prejudice sufficient to outweigh the significant probative value of the evidence of Duncan's gang membership. We draw the same ultimate conclusion with respect to Jackson. His gang validation form was much the same as the others, except that it contained a reference to his being jailed after being apprehended fleeing from a traffic stop. Despite this reference, we discern little danger of unfair prejudice associated with the reference given that the jury also learned that Jackson was incarcerated at the time the victim was killed.

Likewise, we discern little danger of unfair prejudice associated with the photographs. Simply put, there is nothing inflammatory or disquieting about the

---

not contested these factors and has instead focused his argument on the balance between probative value and the danger of unfair prejudice.

[26] Unfair prejudice has been defined as "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." State v. McCaleb, 582 S.W.3d 179, 188 (Tenn. 2019) (citing State v. Banks, 564 S.W.2d 947, 950–51 (Tenn. 1978)).

photographs. One is a close-up of the Defendant in which the tattoo on his arm is visible. The photo appears to have been posted by the Defendant on Facebook, and he can be described best as looking pensively at the camera. The other two photographs show a group of individuals at what appears to be a social gathering. Although certain individuals are displaying gang signs with their hands, there is nothing aggressive or intimidating about the poses. In fact, the individuals in the photographs appear to be doing little more than smiling at the camera and enjoying themselves.

From our review of the record, we discern minimal danger of unfair prejudice associated with the evidence of gang membership, including the gang validation forms and the photographs. Additionally, we note that the trial court gave the jury a limiting instruction multiple times to mitigate potential unfair prejudice from the introduction of evidence of gang membership. We, therefore, conclude that the danger of unfair prejudice associated with the evidence of the Defendant's, Duncan's, and Jackson's gang membership does not outweigh the significant probative value of the evidence.

We previously have summarized that Rule 404(b) evidence is admissible "so long as that evidence is (1) offered to establish something other than action in conformity with a particular character trait, (2) relevant to a material issue at trial, and (3) such that its probative value is not outweighed by the danger of unfair prejudice." Gilliland, 22 S.W.3d at 271. The evidence of gang membership in this case satisfies all three of these requirements. Accordingly, we agree with the Court of Criminal Appeals that the trial court did not abuse its discretion in admitting the evidence.

### ii. *Background Information and the Origins of Gang Signs*

In contrast to the ruling with respect to evidence of gang membership, the Court of Criminal Appeals concluded that the trial court abused its discretion in admitting background information about the Gangster Disciples and the origins of various gang signs. The intermediate appellate court further concluded that the error was not "harmless beyond a reasonable doubt." Reynolds, 2020 WL 3412275, at *26. The State argues in this Court that the Defendant did not preserve this issue for appellate review, and thus, the intermediate appellate court improperly addressed the issue through plenary review principles rather than through plain error principles. Under these circumstances, we must carefully examine both the evidence at issue and the manner in which it was addressed at trial and on appeal.

We note at the outset that it is somewhat unclear from the treatment of the issue by the Court of Criminal Appeals exactly what testimony the court concluded was erroneously

admitted. The court referred to "background information about the Gangster Disciples and the origins of various gang signs." Reynolds, 2020 WL 3412275, at \*26. We will examine what occurred in the trial court to aid our analysis.

As described above, Investigator Penney's testimony at the pretrial hearing included:

(1)     An explanation of hand signs depicting a "7" and a "4" as a reference to the seventh and fourth letters of the alphabet, "G" and "D," for Gangster Disciples;

(2)     An explanation of the six-point star, or Star of David, as a Gangster Disciples symbol, with a specific link to a co-founder of the Gangster Disciples in Chicago, David Barksdale, who came to be known as King David after he passed away;

(3)     An explanation of hand signs depicting a pitchfork as a Gangster Disciples symbol, along with testimony that there is a Folk Nation and a People Nation in the gang or prison system, the Gangster Disciples fall under the Folk Nation, and the pitchfork is derived from Folk Nation;

(4)     Testimony that the Gangster Disciples arose from two different gangs that came together in Chicago; and

(5)     Testimony that the Gangster Disciples operate under two different ideologies—which "started from Larry Hoover on down"—including a "growth and development" movement that strives for community betterment, and a 720 movement, some followers of which "don't even have so much as a parking ticket."

Defense counsel made no specific objection to the five categories of testimony described above at any point during the pretrial hearing. The following week, as the trial opened, defense counsel asked the trial court to reconsider its prior ruling, but defense counsel did not tailor his request to any of the five categories of testimony. Furthermore, during the jury-out discussion immediately before Investigator Penney testified at trial, defense counsel once again did not tailor any objection to the five categories of testimony.

Investigator Penney's trial testimony was much the same as his pretrial hearing testimony, with one principal exception. During his trial testimony, the following exchange occurred:

Q. And what are the bases that the Chattanooga Police Department used to validate Mr. Reynolds as a Gangster Disciple?

A. He received eight points for gang-related tattoos, one of which is a 720 on his arm, and a six-point star on his chest. The 720, this refers to types of ideology. Gangster Disciples have two different types of ideology. One is called the 360, 360 or 360 degrees of pure knowledge of Gangster Disciple [sic].

This is Larry Hoover, who was one of the originators of Gangster Disciples. This was part of their, for lack of better terms, during this time period, this was their idea of "shoot and ask questions later." The – years later – [.]

Defense counsel objected, and a bench conference ensued, at which defense counsel stated:

Your Honor, I can see going ahead and saying, I mean, who was part of the gang and everything, but the history of the gangs, I don't understand that. The "shoot and ask questions later" I think is very prejudicial. I think that – I mean, we're going way afar of just identifying [the Defendant] as a member of a gang.

The trial court commented that Investigator Penney was testifying about the meaning of 720 and stated, "I don't know what it means, I've been in the criminal justice system for 21 years now, so I'm going to allow him to explain."

The State continued with the line of inquiry as to the source of the Defendant's points for "gang tattoo/brands," but the State pivoted away from the 720-tattoo discussion and instead to the close-up photograph of the Defendant that displayed a tattoo on his arm. Referring to the photograph, the State asked Investigator Penney, "What is this?" Penney responded:

A. This is a picture of Mr. Jeremy Reynolds with a tattoo on his, I guess this would be his right arm, with a six-point star that has incorporated the letters G and D. The six-point star, this is a, this is a sign of

- 34 -

> reverence for a, one of the founding fathers of Gangster Disciples in Chicago. His name was – the six-point star –
>
> [DEFENSE COUNSEL]: Objection, relevance, Your Honor.
>
> THE COURT: Overruled.
>
> Q. You can continue, Investigator Penney.
>
> A. The six-point star, it comes from a gentleman by the name of David Barksdale, who was one of the founding fathers, and the Star of David. After he passed away, this was their nod to him, a show of reverence, so the six-point star is used prolifically with the Gangster Disciples.

Having detailed what occurred in the trial court, we return to the decision of the Court of Criminal Appeals. The intermediate appellate court concluded that, with respect to the "background information about the Gangster Disciples and the origins of various gang signs," the danger of unfair prejudice was "very high" and the probative value was "nonexistent," and thus the testimony should have been excluded. Reynolds, 2020 WL 3412275, at *26. The Court of Criminal Appeals ultimately remanded for a new trial, stating that "we cannot say that the improper admission of the extraneous background gang evidence was harmless beyond a reasonable doubt." Id.

The State argues that the Defendant did not preserve a challenge to the background information and origins of gang signs, and thus, the intermediate appellate court incorrectly addressed the issue through plenary review rather than through plain error review. In support of its argument, the State emphasizes that the Court of Criminal Appeals itself noted "that the Defendant did not lodge a specific objection to the breadth of Investigator Penney's testimony at trial or in the motion for a new trial."[27] Id. at *25.

The State is correct that to properly preserve an evidentiary issue for review, a party must raise a timely and specific objection in the trial court either at or before trial. See Tenn. R. Evid. 103(a); State v. Vance, 596 S.W.3d 229, 253 (Tenn. 2020) (stating that

---

[27] This argument is somewhat unavailing, particularly with respect to objections at trial. As we previously detailed, defense counsel made two pertinent contemporaneous objections. The intermediate appellate court considered the objections directly solely at the phrase "shoot and ask questions later" rather than at background information or information about the origins of certain gang signs. Reynolds, 2020 WL 3412275, at *25 n.13. In our view, the objections were not so narrowly tailored.

"evidentiary objections not brought to the trial court's attention at the appropriate time will not be considered under plenary review"). Moreover, in addition to raising a timely and specific objection, a party must raise the issue in a motion for a new trial in order to preserve it for appellate review. See Tenn. R. App. P. 3(e) (stating that "in all cases tried by a jury, no issue presented for review shall be predicated upon error in the admission or exclusion of evidence . . . unless the same was specifically stated in a motion for a new trial"); State v. Harbison, 539 S.W.3d 149, 164 (Tenn. 2018).

With those legal principles in mind, the State's argument that the Defendant did not properly object at trial to the background information and testimony about the origins of gang signs, or include the specific issue in his motion for a new trial, is not without some appeal. However, we also are mindful that "[i]n deciding whether a party has waived an issue on appeal, we do not exalt form over substance but instead review the record carefully to determine whether a party is raising an issue for the first time on appeal." Harbison, 539 S.W.3d at 165. Ultimately, although the State's waiver argument presents a close question in this particular case, we conclude that, even employing plenary review, the admission of the testimony about background information and the origins of gang signs was not reversible error. We explain below.

We first address the testimony from Investigator Penney explaining that certain hand signs depicted a 7, a 4, and a pitchfork. Penney explained that the 7 and 4 referred to the letters G and D, for Gangster Disciples, and that the pitchfork was also associated with Gangster Disciples. In our view, this testimony was clearly relevant and probative in that it would assist the jury in understanding the photographic evidence—which we determined above was properly admitted—so that it could decide whether the State had proved that the Defendant was a member of the Gangster Disciples. Moreover, we believe there was little danger of unfair prejudice, as we discern no undue tendency from this testimony to suggest decision on an improper basis. Investigator Penney's testimony was simply an explanation of the signs and how they represented a tie to the Gangster Disciples. Nowhere was his testimony inflammatory or disquieting, and nowhere did he associate the gang signs with violence. We conclude that the danger of unfair prejudice did not outweigh the probative value of the testimony, and thus the trial court did not abuse its discretion in admitting the testimony.

We reach the same conclusion as to Investigator Penney's explanation of the six-point star. The six-point star appeared in one of the photographs (the Defendant was wearing a six-point-star belt buckle), and it thereby supported points attributed to the Defendant on the gang validation form. Penney's testimony was relevant and had probative value, for without it the jury would have no idea that the Defendant's belt buckle

- 36 -

exhibited a tie to the Gangster Disciples. In fact, even the testimony linking the symbol to David Barksdale—while arguably less relevant—had value, for it assisted the jury's understanding of how the Star of David could be considered a symbol of membership in the Gangster Disciples. Furthermore, we discern minimal danger of unfair prejudice associated with the testimony, even that mentioning how the six-point star was a Gangster Disciples symbol because it was a sign of reverence for David Barksdale. This testimony, like the testimony about gang hand signs, was explanatory, not inflammatory or disquieting. Therefore, we conclude that the danger of unfair prejudice did not outweigh the probative value of the testimony. Thus, the trial court did not abuse its discretion in admitting the testimony.

We next address Investigator Penney's testimony that the Gangster Disciples arose from two different gangs in Chicago, that the Gangster Disciples fall under the "Folk Nation," and that there is another group in the gang system known as the "People Nation." Although this testimony was more background evidence than may have been necessary, we cannot conclude that there was no relevance to this testimony. Investigator Penney mentioned the concept of Folk Nation when explaining how the pitchfork hand sign was a Gangster Disciples symbol. Additionally, like the testimony about the gang signs, this testimony was explanatory rather than inflammatory, and thus it carried minimal danger of unfair prejudice.

We finally address one additional issue regarding evidence of background information about the Gangster Disciples, that which drew the first contemporaneous objection from defense counsel. Investigator Penney, testifying about the process of validating the Defendant as a Gangster Disciples member, referred to the gang validation form. The form attributed points to the Defendant for gang tattoo/brands. In that regard, the form identified that the Defendant had a 720 tattoo. Investigator Penney explained that the 720 tattoo is a Gangster Disciples symbol because it refers to one type of Gangster Disciples ideology. We conclude that this testimony was relevant to the question of whether the Defendant was a gang member, had probative value, and had minimal danger of unfair prejudice.

However, as Investigator Penney explained that 720 refers to a type of Gangster Disciples ideology, he transitioned to testifying about a different type of ideology, 360. Investigator Penney stated, "This was part of their, for lack of better terms, during this time period, this was their idea of 'shoot and ask questions later.' The – years later – [.]"

This testimony carries a danger of unfair prejudice. Additionally, we fail to discern any relevance for this particular evidence, at least not from Investigator Penney's testimony

as it stands in the record. While the existence of a 360 ideology conceivably could help explain the 720 ideology, the simple fact is that Investigator Penney's testimony never connected those dots, and the Defendant's tattoo was a 720, not a 360. Under these circumstances, we believe the trial court erred by allowing this testimony to stand and not issuing a curative instruction.[28]

As a result, we must consider the effect of this error on the Defendant's trial. "All errors are not the same, nor do they have the same effect on the judicial process in general or on a particular trial." Rodriguez, 254 S.W.3d at 371. "[T]his Court has recognized three categories of error—structural constitutional error, non-structural constitutional error, and non-constitutional error." Id. Errors in the admission of evidence ordinarily do not take on constitutional dimensions. Id. at 375. Thus, when a trial court abuses its discretion and admits evidence in violation of the Tennessee Rules of Evidence, we ordinarily address this non-constitutional error using the harmless error analysis of Rule 36(b) of the Tennessee Rules of Appellate Procedure. Clark, 452 S.W.3d at 287. Under Rule 36(b), the defendant bears the burden of showing that the erroneously admitted evidence more probably than not affected the verdict or resulted in prejudice to the judicial process.[29] Tenn. R. App. P. 36(b); Clark, 452 S.W.3d at 287; Rodriguez, 254 S.W.3d at 375.

From our review of the entire record, see Clark, 452 S.W.3d at 288, we conclude that the Defendant has not carried the burden of showing that Investigator Penney's improper testimony more probably than not affected the verdict. Penney's testimony was unfairly prejudicial in that it attributed the "idea of 'shoot and ask questions later'" to Gangster Disciples members, and the State's evidence sought to prove that the Defendant was a member of the Gangster Disciples. However, Penney's testimony itself appeared to attribute the idea to the 360 ideology, and there was never any evidence linking the Defendant to the 360 ideology. The evidence showed that the Defendant's tattoo was a 720, not a 360. In addition, Penney's testimony also gave the impression that the "shoot and ask questions later" idea was associated with a past time period. In his testimony, Penney linked the idea to "during this time period," and followed that statement with "years later," at which point his testimony was interrupted by defense counsel's objection. From

---

[28] We do not disagree with the trial court's assessment when faced with the Defendant's objection that an explanation of what 720 meant would be relevant and probative. However, Investigator Penney's testimony strayed from 720 and ultimately contained an unfairly prejudicial statement.

[29] The Court of Criminal Appeals, in evaluating the effect of the evidentiary errors it identified, stated that "we cannot say that the improper admission of the extraneous background gang evidence was harmless beyond a reasonable doubt." Reynolds, 2020 WL 3412275, at *26. In this respect, the intermediate appellate court employed an incorrect harmless error analysis.

this testimony, it is unclear whether the idea coincided with the time period of the victim's killing.

We again note that the trial court gave the jury limiting instructions on three different occasions during the trial, including at the beginning of Investigator Penney's testimony. The instructions directed the jury not to consider evidence of the Defendant's gang membership—if the jury indeed found the Defendant to be a gang member—to prove his disposition to commit a crime such as the one for which he was on trial. We presume that the jury followed the trial court's instructions. Harbison, 539 S.W.3d at 163; State v. Parker, 350 S.W.3d 883, 897 (Tenn. 2011). We do not agree with the intermediate appellate court that the jury's verdict was contrary to the law and evidence, and thus we do not conclude that the Defendant has shown by clear and convincing evidence that the jury failed to follow the trial court's instructions. See Harbison, 539 S.W.3d at 163. Instead, we conclude that the Defendant has not carried the burden of showing that the improper testimony more probably than not affected the verdict. Thus, any error in the admission of the testimony was harmless.

Accordingly, no reversible error exists concerning the testimony about background information and the origins of gang signs.

### iii. *Robberies Related to the Hi-Point Handgun*

We turn now to the State's argument that the Court of Criminal Appeals incorrectly concluded that the trial court abused its discretion by admitting Officer Early's testimony that included references to recovering the Hi-Point handgun from Jackson's car in the course of investigating robberies unrelated to the killing of the victim. For his part, the Defendant maintains that the trial court erred by admitting evidence of Jackson's "prior bad acts." The Defendant's brief in this Court does not identify Jackson's "prior bad acts." However, in his motion for a new trial, the Defendant refers to the testimony of Officer Early, the "ballistics report," and the testimony of the "parole officer" as evidencing Jackson's prior bad acts.

The State offered the testimony of Officer Early to recount the discovery of the Hi-Point handgun. Officer Early testified that at the time the victim was killed, he worked in the "[r]obbery division" and "[i]nvestigated robberies." He made clear that he was not involved in the investigation of the victim's shooting. Officer Early investigated a robbery on July 29, 2013, and collected .45-caliber cartridge cases at the scene. He investigated a second robbery on August 5, 2013. The following day, August 6, 2013, he stopped a vehicle that matched the description of one from the second robbery. Inside the vehicle

were Jackson, Jeremy Clark, and Greg Hyder. Also inside the vehicle was the Hi-Point handgun. Because the handgun was .45-caliber, Officer Early requested that the cartridge cases he recovered from the scene of the first robbery be tested against the Hi-Point handgun. Ultimately, forensic testing revealed that the Hi-Point handgun was linked to the scene of the victim's shooting.

The State introduced an "Official Firearms Report" for the Hi-Point handgun, presumably the document the Defendant refers to in his motion for a new trial as the "ballistics report." It did not contain the Defendant's name. The report identified the forensic link between the Hi-Point handgun, the cartridge cases and bullet recovered at the scene of the victim's shooting, and the bullet recovered from the bag with the victim's clothing. The report also appeared to confirm a tie to the first robbery that Officer Early investigated, but it is somewhat unclear in this regard. The report, however, does clearly make a reference to that "robbery" in addition to the victim's "homicide."

The State also offered the testimony of Christina Barnes. Barnes testified that she worked as a probation and parole officer for the Tennessee Department of Correction. She simply confirmed that Jackson was in custody in the West Tennessee State Penitentiary on the date the victim was killed.

On direct appeal, the Court of Criminal Appeals stated that "[t]he fact that these robberies occurred, let alone any details surrounding them, was wholly irrelevant to the Defendant's case and should have been excluded." Reynolds, 2020 WL 3412275, at *27. The court concluded that the trial court abused its discretion by allowing this testimony. Id. The court did not discuss the "ballistics report" or the testimony of Christina Barnes. It is unclear whether the intermediate appellate court found the admission of Officer Early's testimony about the robberies to be reversible error, for it did not engage in a harmless error analysis.[30]

The State contends that the Court of Criminal Appeals ignored that the Defendant did not properly preserve the issue for appellate review. Because of the Defendant's failure to preserve the issue, the State argues that this Court should employ plain error review and that the Defendant is not entitled to plain error relief. We agree.

---

[30] At this point in the opinion, the Court of Criminal Appeals had already determined that the trial court's admission of background information about the Gangster Disciples and the origins of various gang signs was reversible error.

- 40 -

The record clearly demonstrates that the Defendant did not object to Officer Early's testimony, the introduction of the "ballistics report," or the testimony of Christina Barnes. As we previously stated, Tennessee law requires a timely and specific objection in the trial court to preserve an evidentiary issue for appellate review. See Tenn. R. Evid. 103(a). "[E]videntiary objections not brought to the trial court's attention at the appropriate time will not be considered under plenary review." Vance, 596 S.W.3d at 253.

Our rules requiring the proper preservation of issues for review serve important purposes, but they are not without a failsafe. The plain error doctrine "has long been recognized as a necessary exception . . . which affords appellate courts discretion to review unpreserved errors and grant relief when fairness and justice demand." State v. Minor, 546 S.W.3d 59, 65 (Tenn. 2018). The doctrine permits appellate courts to consider issues that were not raised properly in the trial court. See Tenn. R. App. P. 36(b) ("When necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of a party at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal."). "We have cautioned, however, that the discretionary authority to invoke the plain error doctrine should be 'sparingly exercised.'" State v. Bishop, 431 S.W.3d 22, 44 (Tenn. 2014) (quoting State v. Bledsoe, 226 S.W.3d 349, 354 (Tenn. 2007)).

Under the plain error doctrine, the court must consider whether:

(1) the record clearly establishes what occurred in the trial court; (2) a clear and unequivocal rule of law was breached; (3) a substantial right of the accused was adversely affected; (4) the issue was not waived for tactical reasons; and (5) consideration of the error is necessary to do substantial justice.

Vance, 596 S.W.3d at 254 (quoting Minor, 546 S.W.3d at 67). The defendant bears the burden of establishing all of these elements. Bledsoe, 226 S.W.3d at 355. The court need not consider all of the elements when it is clear from the record that at least one them cannot be satisfied. Id. Furthermore, to merit relief, "the plain error must be of such a great magnitude that it probably changed the outcome of the trial." Bishop, 431 S.W.3d at 44 (quoting State v. Adkisson, 899 S.W.2d 626, 642 (Tenn. Crim. App. 1994)). Whether the elements of the plain error doctrine have been satisfied is a question of law. State v. Knowles, 470 S.W.3d 416, 423 (Tenn. 2015).

Applying plain error principles in light of the record in this case, we conclude that the Defendant is not entitled to relief. With respect to the testimony of Christina Barnes—

that Jackson was incarcerated at the time the victim was killed—the Defendant has not established that a clear and unequivocal rule of law was breached, that a substantial right of his was adversely affected, or that consideration of the error is necessary to do substantial justice. With respect to the evidence demonstrating that the Hi-Point handgun was discovered in the course of investigating two robberies—both from Officer Early's testimony and the firearms report—it is clear that this proof was far from central to the State's case. The robberies obviously were unrelated to the killing of the victim, they took place three months after the killing, and the Defendant was not once mentioned during this proof. Although the fact that the Hi-Point handgun was discovered in the course of investigating two unconnected robberies was irrelevant to the Defendant's case and therefore inadmissible, see Tenn. R. Evid. 402, this evidence was much too tangential to have probably changed the outcome of the trial. Accordingly, we conclude that the Defendant is not entitled to plain error relief for the trial court's admission of this evidence.

### iv. *Names of Gang Members Unconnected to the Case*

The final instance of gang-related evidentiary error addressed by the Court of Criminal Appeals involves the trial court's admission of testimony identifying the names of gang members who were not connected to the victim's shooting. The extent of the treatment of the issue by the intermediate appellate court was a single sentence: "Likewise, although it is not specifically raised as an issue, we note that the repeated mention of the names of several other gang members who were not connected to this case was irrelevant and improperly admitted." Reynolds, 2020 WL 3412275, at *27. The parties do not directly address this issue in their briefs before this Court. Although the Court of Criminal Appeals identified the admission of this testimony as error, we conclude that the issue is not properly before this Court. See Hodge v. Craig, 382 S.W.3d 325, 334 (Tenn. 2012) (stating that "issues are properly raised on appeal to this Court when they have been raised and preserved at trial and, when appropriate, in the intermediate appellate courts and when they have been presented in the manner prescribed by [Rule 27 of the Tennessee Rules of Appellate Procedure]" (footnote omitted)).

Additionally, the Defendant did not include any such challenge in his motion for a new trial. Moreover, as noted by the Court of Criminal Appeals, the Defendant did not identify the issue on direct appeal to that court. Under these circumstances, plenary review of the trial court's admission of this evidence is clearly unavailable. See Vance, 596 S.W.3d at 253; Harbison, 539 S.W.3d at 164 & n.11; Bishop, 431 S.W.3d at 43.

In looking to the plain error doctrine, we have no hesitation concluding that the Defendant is not entitled to relief as to the admission of this evidence. Much like the

evidence that the Hi-Point handgun was recovered during the investigation of unrelated robberies, the names of unconnected gang members were much too tangential to the core of the State's case to have probably changed the outcome of the trial. Accordingly, we conclude that the Defendant is not entitled to plain error relief for the trial court's admission of this evidence.

### C.    Photograph of Jeremy Clark

The next issue for our consideration is the Defendant's challenge involving a photograph of him with Jeremy Clark. The Defendant's gang validation form, in supporting the points attributed to the Defendant under the category of "participating in photo with confirmed gang members," contained the statement, "In photo with Jeremy Clark and Christian Woods, both GD." The Defendant argues on appeal that the trial court erred by not compelling the State to produce a photograph of him with Jeremy Clark. The Defendant further argues that the State's failure to produce the photograph constituted a Brady violation. The Court of Criminal Appeals rejected these arguments. Reynolds, 2020 WL 3412275, at *29.

To the extent the Defendant argues that the trial court erred by not compelling the State to produce the photograph, his argument clearly lacks merit. The record plainly demonstrates that the trial court, in fact, did order the State to produce the photograph.

As for the argument that the State's failure to produce the photograph constituted a Brady violation, the Defendant did not argue that the State's failure to produce the photograph constituted a Brady violation before the trial court. At no time during trial or in his motion for a new trial did the Defendant frame the issue regarding the photograph of him with Jeremy Clark as a Brady violation.[31] The Defendant argued that the State's failure to produce the photograph constituted a Brady violation for the first time in his brief before the Court of Criminal Appeals. Accordingly, we conclude that the Defendant has waived the argument. See Harbison, 539 S.W.3d at 164 ("Grounds not raised in a motion for new trial are waived for purposes of appeal.").

---

[31] In his second amended motion for a new trial, the Defendant argued that "[t]he Court erred in not compelling the State to produce the photograph referred to in the Gang Report that was used by the State."

### D.    *Cumulative Error*

The final issue presented to this Court is the Defendant's argument that the cumulative effect of the errors at trial, even if individually harmless, impinged on his right to a fair trial.

> The cumulative error doctrine is a judicial recognition that there may be multiple errors committed in trial proceedings, each of which in isolation constitutes mere harmless error, but which when aggregated, have a cumulative effect on the proceedings so great as to require reversal in order to preserve a defendant's right to a fair trial.

State v. Hester, 324 S.W.3d 1, 76 (Tenn. 2010). Because a defendant is not guaranteed a perfect trial, the circumstances warranting the reversal of a conviction under the cumulative error doctrine are rare. Id.

As our above treatment of the issues presented for appeal demonstrates, we found only one evidentiary error at the Defendant's trial—that related to Investigator Penney's "shoot and ask questions later" testimony. We concluded that the error was harmless. Under these circumstances, the cumulative error doctrine affords the Defendant no relief.

## III.    CONCLUSION

For the foregoing reasons, we hold that the evidence was legally sufficient to support the Defendant's conviction for premeditated first-degree murder. We further hold that there was no reversible error with respect to the trial court's admission of gang-related evidence or any other evidentiary issue properly raised by the Defendant. Accordingly, we reverse the decision of the Court of Criminal Appeals and reinstate the Defendant's conviction for premeditated first-degree murder.

Because the Defendant appears to be indigent, the costs of this appeal are taxed to the State.

_____
JEFFREY S. BIVINS, JUSTICE